# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

LARRY B. HAMPTON,

               Plaintiff,               Case Number:  04-CV-71966-DT

v.                                    JUDGE PAUL D. BORMAN
                                    UNITED STATES DISTRICT COURT

ANTHONY MUHAMMAD, BARBARA J.
SAXTON, LINDA PARAMORE-LEWIS, and
SOUTHFIELD PUBLIC SCHOOL DISTRICT,

               Defendants.

_____ /

## OPINION AND ORDER:
## 1) DENYING SUMMARY JUDGMENT ON PLAINTIFF'S § 1983 CLAIMS
## AS TO THE DISTRICT, MUHAMMAD, AND SAXTON,
## 2) GRANTING SUMMARY JUDGMENT ON PLAINTIFF'S § 1983 CLAIMS
## AS TO LEWIS; AND
## 3) GRANTING SUMMARY JUDGMENT ON PLAINTIFF'S STATE-LAW TORTIOUS-
## INTERFERENCE AND PUBLIC-POLICY CLAIMS AS TO ALL DEFENDANTS

Now before the Court is a motion for summary judgment on all of Plaintiff's claims by

Defendants Anthony Muhammad ("Muhammad"), Barbara J. Saxton ("Saxton"), Linda

Paramore-Lewis ("Lewis"), and the Southfield Public School District ("the District").  The Court

heard oral argument on July 29, 2005.  Having considered the entire record, and for the reasons

that follow, the Court:

    1)        DENIES the District, Muhammad, and Saxton summary judgment on Plaintiff's §
             1983 claims;

    2)        GRANTS Lewis summary judgment on Plaintiff's § 1983 claims;

    3)        GRANTS Defendants summary judgment on Plaintiff's state-law tortious-
             interference claims; and

1

4)      GRANTS Defendants summary judgment on Plaintiff's state-law public-policy claims.

## I. BACKGROUND

In 1999, Larry Hampton ("Plaintiff") began work as a substitute teacher for the Southfield Public School District ("the District"). (Pl. Dep. at 83.)  Plaintiff served as a substitute teacher exclusively at the Levey Middle School ("Levey"), the principal of which was Muhammad. (*Id.* at 92; Muhammad Dep. at 4.)  According to Muhammad, he could recommend the removal of a substitute teacher to the Director of Human Resources for the District, who would investigate, if necessary, and who would make the determination.[1] (Muhammad Dep. at 7-8, 35; Lewis Dep. at 8, 14-15; Rice Dep. at 17.)

In the spring of 2004, the City of Southfield placed on the ballot for March 29, 2004, the issue of whether to renew a millage for the District. (Br. at 2; Resp. at 3.)  If the millage failed, the District, which was in desperate need of funding for operating expenses, anticipated massive layoffs, school consolidations, and the elimination of transportation services and certain buildings. (Rice Dep. at 22-24.)  Although all employees in the District were asked to support the millage, there was no mandate that they vote in favor of the millage. (Lewis Dep. at 18-19.)  According to Plaintiff, the District sponsored various community meetings, marches, rallies, sign distributions, phone-bank campaigns, and millage-support committees. (Rice Dep. at 25-28.)

---

[1]Cecil Rice, then Superintendent of the District, testified that the Human Resources' Director had the authority to recommend, without Rice's approval, the termination of teachers, including substitutes, to the Board of Education, and that the Board would then vote on that recommendation. (Rice Dep. at 21-22; 45-46.)  However, Saxton, then Human Resources' Director, testified that she had sole authority to remove an individual from the District's substitute-teaching list, and that she needed neither Rice's nor the Board of Education's approval. (Saxton Dep. at 45.)  Saxton testified that Board action was necessary only for the termination of for-cause employees, not at-will substitute teachers. (*Id.* at 67.)

2

Opposition to the millage chiefly centered on concerns over raises in property taxes. (*Id.* at 25-26.)

## A. Plaintiff's Speech

During the millage campaign, Plaintiff was serving a short-term assignment as a substitute teacher at Levey. (Br. at 2.)  On March 23, 2004, Plaintiff, a Southfield resident, and Richard Zager ("Zager"), a sixth-grade teacher who is not a Southfield resident, discussed the upcoming millage election in the teachers' lounge.  (Pl. Dep. at 97-98; Zager Dep. at 4, 11.) According to Plaintiff, Zager stated that, if the millage failed, it would devastate the District and cause property values to decline, and Plaintiff responded that he knew residents of the District who opposed the millage due to concerns about high property taxes and MEAP scores.   (Pl. Dep. at 97-98, 102.)  Plaintiff testified that the conversation was "quiet" and "short." (*Id.* at 95-96.)

Zager testified that, during their conversation in the teachers' lounge, Plaintiff had explained why he "was going to vote against" the millage and Zager explained why he "was in favor of the millage."[2]  (Zager Dep. at 6-9.)  Zager testified that, although he was "frustrated" out of concern for the millage's failure and disagreed with Plaintiff's opinion, Zager supported Plaintiff's right to express that opinion.  (*Id.* at 12.)  According to Zager, their "brief" exchange was not heated, and Plaintiff did not raise his voice but, rather, acted professionally.  (*Id.* at 6, 13, 28, 34.)  Zager testified, however, that he "could see [that] some people felt tense" such that

---

[2]Zager could not recall whether anyone else was in the teachers' lounge at this time, but believed that other people participated in the "group discussion." (Zager Dep. at 6, 12, 25-26.) Zager testified that neither Carter nor Weaver were in the teachers' lounge when he was.  (*Id.* at 32.)

3

he decided to leave.  (*Id.* at 28.)  According to Zager, when he left, Plaintiff was still in the teachers' lounge.  (*Id.* at 12.)

On that same day, Plaintiff and Frank Weaver ("Weaver"), the school's Peer Mediation Specialist and a non-resident of Southfield, discussed the upcoming millage election in the teachers' lounge.  (Pl. Dep. at 99-100; Weaver Dep. at 24.)  According to Plaintiff, Weaver stated that he was campaigning for the millage because, if it failed, the District would not have enough funding to operate and schools would close, and Plaintiff responded that he could "understand" why some people in the District opposed the millage out of concerns for higher taxes and low MEAP scores.  (Pl. Dep. at 100-01.)  Plaintiff testified that it was a short, one-on-one conversation at normal volume, and that no one else was present in the lounge at that time. (*Id.* at 99, 101.)

Weaver testified that, while he and Plaintiff were in the teachers' lounge, Plaintiff "kept talking about . . . [how] he was not in favor of the millage," and Weaver told Plaintiff that he should try to change the system instead of complaining about it.  (Weaver Dep. at 27-28.) Weaver testified that Plaintiff was "entitled to his own opinion" and nobody had a problem with his opposition to the millage.  (*Id.* at 26-27.)  According to Weaver, Plaintiff got "loud"; became "boisterous" and "very unprofessional"; and acted "out of control."  (*Id.* at 25, 28.)  According to Weaver, Plaintiff acted like "he was going to fight somebody" based upon his "mannerisms" and "tone of voice."  (*Id.* at 26, 28, 52.)  Weaver testified that Plaintiff "was extremely, extremely mad," was "very upset," and acted like he "wanted to fight" and like he "was going to blow up." (*Id.* at 53.)  According to Weaver, he felt threatened and exited the teacher's lounge, but Plaintiff followed him to the door.  (*Id.* at 28-29, 53.)  Weaver testified that Plaintiff was still "real loud"

4

and that Weaver could hear Plaintiff "yelling out in the hallway" as Weaver was heading to his office.  (*Id.* at 28, 31.)

On that same day, Plaintiff and Rodney Carter ("Carter"), a substitute teacher and non-resident of Southfield, discussed the upcoming millage election.  (Pl. Dep. at 103; Carter Dep. at 4.)  According to Plaintiff, the conversation occurred while they were alone in a vacant classroom.  (Pl. Dep. at 103.)  Plaintiff testified that Carter stated that, if the millage failed, the District would have to lay off teachers and eliminate programs, and that Plaintiff replied that he could understand why people opposed the millage because of the high property taxes and the low MEAP scores.  (*Id.* at 103-04.)

Carter testified that, while in the teachers' lounge, Carter, Plaintiff, Zager, and Weaver began discussing the school millage.  (Carter Dep. at 12, 16.)  According to Carter, he stated that it was necessary for the millage to pass or else the District would have to lay off teachers and shut down schools.  (*Id.* at 16.)  Carter testified that Plaintiff went "into a rage about the millage, about how it had to be defeated, and [how] he was going to do everything to make sure it was defeated."  (*Id.* at 16.)  According to Carter, he was "startled, not because of him talking against it, but because . . . he just became very angry."  (*Id.* at 16.)  Carter testified that Plaintiff "built up with a lot of anger all of a sudden."  (*Id.* at 17.)  According to Carter, the "situation changed from a calm atmosphere" to one that caused Carter to "walk out."  (*Id.* at 16.)  Carter testified that he left because he felt "uncomfortable" and he wanted to diffuse the situation.  (*Id.* at 34.)  According to Carter, Plaintiff was still in the teachers' lounge when Carter left.  (*Id.* at 18, 36.)

## B.  Plaintiff's Termination

Muhammad testified that he "heard something" from the teachers' lounge and then

observed Plaintiff, Carter, and Weaver exiting the lounge.  (Muhammad Dep. at 19.)

Muhammad testified that the dynamic between them seemed "combative" and Carter and

Weaver had "disturbed" and "perplexed" looks on their faces.  (*Id.* at 19, 23.)  Muhammad

testified that he believed that he was observing the tail-end of an argument.  (*Id.* at 23.)

According to Muhammad, he approached Carter and Weaver and asked them what was going on,

and they told him that Plaintiff was "yelling"; being "very aggressive," "loud" and "boisterous";

arguing against the millage; and "picking fights with people."  (*Id.* at 25-26.)  Muhammad

testified that Carter and Weaver told him that Zager had also been involved in the argument. (*Id.*

at 19, 25.)  Muhammad testified that, shortly thereafter, he spoke to Zager, and that Zager

"verified that there was an argument in the lounge."  (*Id.* at 25.)  Specifically, Muhammad

testified that Zager stated that there was a "debate" about the millage; that Plaintiff was opposed

to the millage; and that Plaintiff was "pretty aggressive."  (*Id.* at 28, 47.)

Muhammad testified that, during another one of Plaintiff's substitute-teaching

assignments at Levey, Muhammad had received complaints from parents that Plaintiff was

aggressive and used challenging words with students  (Muhammad Dep. at 39.)  Muhammad

testified that, after speaking with Carter, Weaver, and Zaker, he had "enough different opinions"

about Plaintiff's "confrontation" to recommend to the District Plaintiff's removal as a substitute

teacher. (*Id.* at 29.)  According to Muhammad, it was the District's prerogative to investigate the

situation further, if necessary.  (*Id.* at 29.)

However, Weaver and Zager testified that, before the instant lawsuit, they never spoke to

any school administrator or teacher about their conversations with Plaintiff.  ( Weaver Dep. at

33-35; Zager Dep. at 13-14, 33.)  Carter testified that, after he left the teachers' lounge that day,

he did not discuss the incident with Muhammad or anyone else. (Carter Dep. at 19-20.)  Carter

testified, however, that, during a phone bank, he told Muhammad that Plaintiff was "very upset

about" and "working against" the millage passing; Carter did not know whether he did so before

or after the March 29, 2004, millage.[3]  (*Id.* at 22-23.)

Approximately one or two days after the incident, Muhammad contacted Saxton, then

Human Resources' Director of the District, and requested that Plaintiff be removed as a

substitute teacher from the District.  (Muhammad Dep. at 16.)  Muhammad testified that he

explained that it had been reported to him that Plaintiff had a "combative" and "unprofessional"

argument with staff members and had an "explosive temper."  (*Id.* at 16-18.)  According to

Muhammad, Saxton requested that he put his request in writing.  (*Id.* at 17.)

On March 24, 2004, Muhammad sent an e-mail to Janet Broom ("Broom"), Saxton's

secretary, and Lewis, then Associate Superintendent of the District, and Cecil Rice ("Rice"),

then Superintendent of the District.  That e-mail stated, in pertinent part:

> I am requesting that Larry Hampton be dropped from the Southfield Public
> Schools substitute teacher system.  On Tuesday, Mary 23, 2004, Mr. Hampton
> was involved in an argument with staff members at Levey in the teachers lounge
> because he felt that the millage renewal should not pass because our district has
> not earned the renewal.  It is appalling to think that any employee who benefits
> from employment in the district be openly opposed to the millage, especially
> someone as expendable as a substitute teacher.  It is my hope that he never earns
> another dime from working in the district.

(Defs.' Ex. C at 31-35.)

Muhammad testified that he recommended Plaintiff's removal from the District's

substitute-teaching list because Plaintiff had argued with staff members in an unprofessional

---

[3]Carter also testified that he may have discussed the incident with Weaver or Zager a week or
so after it because Weaver was "pretty upset."  (Carter Dep. at 20-21.)

manner. (Muhammad Dep. at 33-34.) Muhammad testified that the remainder of the e-mail simply expressed his opinion about Plaintiff's opposition to the millage, but that such opposition did not motivate his personnel recommendation. (*Id.* at 30, 34.)

Lewis testified that, upon her receipt of this e-mail, she was concerned that Plaintiff had engaged in an argument with staff members while on school grounds. (Lewis Dep. at 20.) According to Lewis, she was solely focused on the fact that the argument occurred in the first instance, not the content of the argument or Muhammad's opinion about that content. (*Id.*) Lewis ordered Plaintiff's removal from Levey's substitute-teaching list until Saxton, who was out of the office that day, investigated the complaint.[4] (*Id.* at 18-20, 24.)

Both Muhammad and Saxton testified to discussing, over the telephone, Muhammad's recommendation of Plaintiff's removal. (Saxton Dep. at 15; Muhammad Dep. at 48.) According to Saxton, Muhammad told her that he was "quite upset" about and "uncomfortable with" Plaintiff's behavior because he was "loud and argumentative" and it was "very disturbing to people in the building." (Saxton Dep. at 15.) Saxton testified that, although Muhammad told her that Plaintiff was "pretty adamant" about the District not deserving the millage, "the bigger issue from . . . Muhammad's point of view [wa]s the escalating conversation, the anger, the loudness of it" and how it was "unnerving and upsetting to the teachers." (*Id.* at 16.) Saxton testified that her understanding from Muhammad was that "the teachers were quite concerned and went to him." (*Id.* at 17.) According to Muhammad, he told Saxton that he was recommending Plaintiff's removal as a substitute teacher because Plaintiff was "argumentative and

---

[4]According to Lewis, although she had no "direct responsibility" for the District's substitute-teaching system, she was the only administrator present in the District that day. (Lewis Dep. at 18.)

unprofessional" with staff members.  (Muhammad Dep. at 48.)

Upon reporting for a substitute-teaching assignment at Thompson Middle School in the District, Plaintiff was informed that he did not have an assignment for that day.  (Pl. Dep. at 109.) Plaintiff testified that, when the telephone assignment system did not accept his identification number, he called the District's administrative offices and learned that all of his assignments had been deleted from the system.  (*Id.* at 109-10.)

Upon speaking, Saxton and Plaintiff arranged to meet on March 29, 2004, the day of the millage election.[5]  (Pl. Dep. at 112-13.)  According to Plaintiff, at their meeting, Saxton told Plaintiff that he could not work in the District because a younger teacher at Levey had reported that he was against the millage, and that it was the District's opinion that, if you were opposed to the millage, you had no business working for the District.  (*Id.* at 114, 120-22.)  Plaintiff testified that Saxton explained that the situation was analogous to being unable to work for the President in the White House if you had an opinion contrary to his.  (*Id.* at 115.)

However, Saxton testified that, at their meeting, she neither told Plaintiff nor was told to tell Plaintiff that he could not work for the District if he opposed the millage.  (Saxton Dep. at 37, 60-61.)  Rather, Saxton testified that she told Plaintiff that he was preliminarily removed[6] as a substitute teacher because of inappropriate behavior and, in particular, because he was "very loud and very argumentative."  (*Id.* at 19, 27, 55-56.)  According to Saxton, she told Plaintiff that the tension in the District due to the millage was "bad enough without having adults arguing in

---

[5]Although the millage renewal failed on March 29, 2004, Southfield residents passed a reduced millage on June 14, 2004.  (Resp. at 7 n.3.)

[6]Saxton testified that Rice directed her to remove Plaintiff from the District's substitute-teaching lists pending the results of her investigation.  (Saxton Dep. at 55-56.)

9

the hall over an issue." (*Id.*)  Saxton testified that she told Plaintiff that, just as the District

would not "allow students to get into a yelling loud argumentative argument in the hall," it

would not permit that "kind of behavior from adults." (*Id.*)  According to Saxton, Plaintiff

apologized, stated that it was a misunderstanding–that he did not intend "for people to be

offended or uncomfortable"–, and did not deny the alleged behavior.[7]  (*Id.* at 25, 33, 36.)  Saxton

testified that she supported Plaintiff's removal from the District's substitute-teaching list, not

because of the content of Plaintiff's speech or Muhammad's opinions regarding the content of

that speech, as expressed in his e-mail, but, rather, because Plaintiff had not denied the disruptive

manner of his speech.[8] (*Id.* at 26-29.) Saxton further testified that, after her meeting with

Plaintiff, she advised Rice of her conversation with Plaintiff and that he did not deny his alleged

combative and disruptive conduct, and waited for his direction.  (*Id.* at 25, 33.)

　　　Rice testified that, although he did not recall reading Muhammad's email, Saxton

discussed it with him and told him that a substitute teacher, who opposed the millage, had an

argument in the hallway with staff members.  (Rice Dep. at 33-34.)  According to Rice, Saxton

told him that Muhammad was upset because the argument was "loud"; it occurred on school

grounds and in a "place where students might have had an opportunity to observe" the negative

"portrayal of adult behavior"; and it disrupted the school atmosphere.  (*Id.* at 35, 37.)  Rice

testified that, upon discussing the matter with Saxton, whom he employs to "handle that

_____

[7]Saxton testified that Plaintiff admitted that the conversation was "a little testy," "high volume," "heated," and "argumentative," and that other staff members were involved. (Saxton Dep. at 33.)

[8]Saxton testified that another individual had been removed from the District's substitute-teaching list for being "extremely hostile with the teachers" and "contentious." (Saxton Dep. at 40-43.)

business," and learning that she approved Muhammad's recommendation, Rice supported that recommendation as well. (*Id.* at 39-40, 43.) Rice testified that he recommended Plaintiff's removal as a substitute teacher based upon his "disruptive behavior," as described by Saxton, not because of his opposition to the millage. (*Id.* at 53.)

On April 8, 2004, Plaintiff sent Saxton a letter requesting her reconsideration of Plaintiff's removal from the District's substitute-teaching list. (Pl. Dep. at 124; Ex. 12.) Filing the letter in Plaintiff's personnel file, Saxton took no action on Plaintiff's request. (Saxton dep. at 38, 40.) On May 3, 2004, Plaintiff, via his attorney, again sent Saxton a letter requesting Plaintiff's reinstatement. (Pl.'s Ex. 13; Resp. at 7.) Saxton simply passed on Plaintiff's letter to the Director of Labor Relations. (Saxton Dep. at 46, 51-52.)

### C. The Lawsuit

On May 24, 2004, Plaintiff filed suit against the District, Muhammad, Saxton, and Lewis (collectively "Defendants"). Count I alleges that Defendants violated Plaintiff's First and Fourteenth Amendment right to be free from retaliation for speech on matters of public concern, as actionable via 42 U.S.C. § 1983.[9] (Compl. at ¶¶ 36-38.) Count II alleges that the individual Defendants interfered with Plaintiff's employment/business relationship with the District in violation of Michigan law. (*Id.* at ¶¶ 39-46.) Count III alleges that Defendants discharged Plaintiff for the purpose of influencing his vote at an election in violation of Michigan public policy, M.C.L.A. 168.931(b). (*Id.* at ¶¶ 47-51.)

---

[9]Count I does not specify through which capacities of Defendants it seeks the requested relief. The Eleventh Amendment bars any claims against state officials in their official capacity for damages, rather than for injunctive or declaratory relief. *Dugan v. Brooks,* 818 F.2d 513, 515 n.2 (6th Cir. 1987).

In October of 2004, Muhammad asked Zager, Carter, and Weaver to prepare statements about their conversations with Plaintiff on the millage "for legal purposes." (Muhammad Dep. at 43-46; Resp. at 7; Zager Dep. at 18-19.) Of special note, Weaver testified that he never discussed with Muhammad or anyone else the incident with Plaintiff until Muhammad, at some time that Weaver could not recall, approached Weaver outside of his office and asked him if anything had happened in the teachers' lounge with Plaintiff. (Weaver Dep. at 32-34, 38.) According to Weaver, he told Muhammad that Plaintiff became "loud," "boisterous," "very unprofessional," and "adamant"; was against the millage; and "came out in the hallway and got loud." (*Id.* at 44.) Weaver testified that Muhammad asked Weaver to provide him with a written statement about what had happened. (*Id.* at 42, 44.)

Muhammad allegedly had no involvement in the content of those statements. (Muhammad Dep. at 44, 46-47; Weaver Dep. at 45-46; Carter Dep. at 31; Zager Dep. at 22.) In his statement, dated October 4, 2004, Zager wrote that Plaintiff expressed his opinion that he would oppose and vote against the passage of the renewal and that "[t]his view seemed to upset some of the staff members present." (Pl.'s Ex. 9.) Weaver's undated statement provides that Plaintiff was involved in a "serious argument"; was "very adamant about defeating the millage at any cost"; was "very unprofessional"; and "extremely loud causing a disruption in the school day." (*Id.*) Carter's statement, dated October 4, 2004, provides that Plaintiff "became verbally hostile" while trying to "explain to others why the election had to be defeated at all cost," and was "out of control." (*Id.*)

Now before the Court is Defendants' motion for summary judgment on all of Plaintiff's claims against them, which motion was filed on May 3, 2005.

12

## II. ANALYSIS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A "material" fact is one "that might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A "genuine" issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. In deciding a motion for summary judgment, the Court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586.

### A. § 1983 Claims

To state a claim against a municipality under § 1983 for monetary, declaratory, or injunctive relief, a plaintiff must show: 1) a deprivation of his constitutional or federal rights; 2) that occurred pursuant to a custom, usage, or official policy of the municipality.[10] *Monell v.*

---

[10]Regarding this latter requirement, § 1983 liability attaches to a municipality only when the execution of its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," inflicts the injury upon the plaintiff. *Monell,* 436 U.S. at 694. The policy or custom must originate from the "official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. Cincinnati,* 475 U.S. 469, 483 (1986). However, a "policy" is simply "a deliberate choice to follow a course of action . . . from among various alternatives" and, thus, under appropriate circumstances, municipal liability may lie "for a single decision by municipal policymakers." *Id.*

13

*Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690-91 (1978).  To state a claim

under 42 U.S.C. § 1983 against a defendant in his individual capacity, the plaintiff must show

that: 1) the defendant; 2) acted under color of state law; and 3) deprived him of a federal right.

*Sperle v. Mich. Dep't of Corrections,* 297 F.3d 483, 490 (6th Cir. 2002).

### 1.  First-Amendment Violation

The First Amendment prohibits a state from discharging an employee–even one who is

employed at will–for exercising his constitutional right to freedom of speech.  *Rankin v.

McPherson,* 483 U.S. 378, 383 (1987).  To establish a retaliatory discharge from public

employment in violation of the First Amendment, a plaintiff must demonstrate that: 1) the First

Amendment protected his speech; and 2) that his speech was a substantial or motivating factor in

his discharge.  *Jackson v. Leighton,* 168 F.3d 903, 909 (6th Cir. 1999)  Once the plaintiff meets

this burden, the government bears the burden of demonstrating that it would have discharged the

plaintiff absent his protected speech.  *Id.*

In deciding whether the challenged speech was constitutionally protected, the Court must

first determine whether the speech touched upon a matter of public concern.  *Pickering v. Bd. of

Educ. of Township High School District 205*, 391 U.S. 563, 568 (1968).  A matter of public

concern generally involves a "matter of political, social or other concern to the community."

*Jackson,* 168 F.3d at 909.  Here, Plaintiff's speech concerning opposing views on the renewal of

the school millage touched upon a matter of public concern.  *See Pickering,* 391 U.S. at 571-72

(recognizing that "[t]he question [of] whether a school system requires additional funds is a

matter of legitimate public concern"); *Farmer v. Cleveland Public Power,* 295 F.3d 593, 600 (6th

Cir. 2002) (holding that the issue of whether speech touches upon a matter of public concern is a

question of law).  (Resp. at 9; Br. at 5.)

Where the speech does, in fact, touch upon a matter of public concern, as here, the Court must then apply the balancing test set forth in *Pickering*.  *Farmer,* 295 F.3d at 599-600.  This test attempts to strike the proper balance "between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering*, 391 U.S. at 568.  Under the *Pickering* test, the Court must consider the "manner, time, and place of the employee's expression" as well its context.  *Rankin,* 483 U.S. at 388.  Also relevant are such considerations as whether the speech "impairs . . . harmony among co-workers, . . . impedes the performance of the speaker's duties, or interferes with the regular operation of the enterprise."  *Id.*  As the Supreme Court has recognized:

> . . . [T]he state interest element of the test focuses on the effective functioning of the public employer's enterprise.  Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest.

*Id.*  On the other hand, "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of the employees' speech."  *Id.* at 384.

Defendants asserts that the First Amendment, as a matter of law, does not protect Plaintiff's speech.  (Br. at 6.) Specifically, Defendants maintain that Defendants' interest in preserving the efficiency of the public services that the District provides outweighed Plaintiff's interest in expressing himself on the millage in the manner that he did. (Br. at 5-6.)   As to the manner of Plaintiff's speech, Defendants assert that Plaintiff had "explosive arguments" with the

15

staff members and was unprofessional and aggressive.  (Muhammad Dep. at 22-25; 31-35; Br. at

8.)  Defendants assert that the manner of Plaintiff's speech breached the requisite decorum

among the staff; disrupted and instilled hostility into the working environment; and threatened to

damage the staff members' close working relationships. (Br. at 6, 8.)

Plaintiff, in turn, asserts that a reasonable jury could find that Plaintiff's speech did not

disrupt the workplace to the extent that any such disruption outweighed Plaintiff's interests in his

speech.  (Resp. at 13.)  As recited above, Plaintiff maintains that the manner of his speech was

neither combative nor disruptive.  Indeed, Plaintiff testified that he engaged in "short, one-on-

one brief exchanges made in private" during the course of one day.  (*Id.* at 10.)  Plaintiff notes

that Zager testified that Plaintiff never raised his voice or behaved unprofessionally during his

conversation with Zager.  (*Id.*; Zager Dep. at 13, 34.)  Plaintiff asserts that, after the

conversations, the staff members resumed their duties "with no problems."  (Resp. at 10; Carter

Dep. at 28.)  Plaintiff contends that the evidence, when viewed in his favor, does not demonstrate

that the manner of his speech caused any disruption or workplace disharmony.[11] (Resp. at 10.)

Defendants, in reply, argue that the relevant issue is whether they reasonably believed

that the manner of Plaintiff's speech was combative and disruptive, not whether it actually was

so.  (Reply at 3.)  Defendants contend that, although Plaintiff denied raising his voice or being

combative during his interchanges with Zager, Weaver, and Carter, Muhammad reasonably

believed that Plaintiff did, in fact, engage in such unprofessional and explosive conduct based

---

[11]Plaintiff asserts that this case is analogous to that in *Rankin,* in which the Supreme Court
rejected the notion that one day of private casual conversation between co-workers could impair
workplace harmony or the employer's efficient operation.  (Resp. at 11.)   Defendants argue that
*Rankin* is inapposite because, unlike in this case, the employer eschewed any claim that the
employee's speech disrupted the workplace.  (Reply at 3.)

16

upon the teachers' reports, especially since Muhammad previously had received complaints from parents about Plaintiff's aggressive behavior. (Br. at 8.) As Defendants point out, Muhammad testified that he saw the tail-end of an argument in the hallway between Plaintiff, Carter and Weaver and that, either immediately or shortly thereafter, Carter, Weaver, and Zager, upon being approached by Muhammad, complained to Muhammad about the manner of Plaintiff's speech. (Reply at 1-2; Muhammad Dep. at 18-19, 22, 24-26.) Defendants contend that, the day after learning of Plaintiff's unprofessional conduct, Muhammad requested Plaintiff's removal as a substitute teacher. (Reply at 2.) Defendants underscore that Carter and Weaver testified that the manner of Plaintiff's speech was combative and disruptive. (*Id.*)

Along with denying that the manner of his speech was, in fact, combative and disruptive, Plaintiff, in essence, impugns Defendants' contention that they terminated Plaintiff based upon the alleged manner of his speech rather than the content of that speech. Plaintiff challenges as false Muhammad's testimony that he saw the tail-end of an argument between Plaintiff, Carter and Weaver in the hallway and that, either immediately or shortly thereafter, Carter, Weaver, and Zager, upon being approached by Muhammad, complained to Muhammad about the manner of Plaintiff's speech. (Resp. at 11.) First, Plaintiff underscores that Carter testified that he left the teachers' lounge before the others. (Carter Dep. at 18, 20; Resp. at 12.) Second, Weaver and Zager testified that, before the instant lawsuit, they never spoke to Muhammad or any school administrator about their conversations with Plaintiff, and Carter testified that, after he left the teachers' lounge, he did not discuss the incident with Muhammad or anyone else that day.[12]

_____

[12]Although Carter testified that, during a phone bank, he told Muhammad that Plaintiff was "very upset about" and "working against" the millage passing, he did not know whether he did so before or after the March 29, 2004, millage. (Carter Dep. at 22-23; Reply at 1.)

(Weaver Dep. at 33-35; Zager Dep. at 13-14, 33; Carter Dep. at 19-20.)  Lastly, Plaintiff points to Muhammad's email as evidence of the animus that Muhammad had for the content of Plaintiff's speech. (Resp. at 13.)  As to Muhammad's testimony concerning the alleged parental complaints against him, Plaintiff notes that Muhammad took no action on them, and that only Muhammad's testimony supports their existence.  (Muhammad Dep. at 40; Saxton Dep. at 29; Resp. at 12.)

Plaintiff also impugns, in the first instance, Weaver's and Carter's characterizations of the manner of Plaintiff's speech as combative and disruptive.  As Plaintiff underscores, it was only in their post-lawsuit depositions and statements that Weaver and Carter began to describe their conversations with Plaintiff in "dramatic negative terms."  (Resp. at 8.)  For purposes of bias, Plaintiff underscores that Weaver and Carter are current employees of the District and work under Muhammad's authority.  (*Id.*)  Plaintiff argues, in essence, that Weaver and Carter falsely represented that the manner of Plaintiff's speech was combative and disruptive only so as to defeat the instant lawsuit.

Defendants maintain that Plaintiff was not terminated based upon the content of his speech.  In support, Defendants note that other staff members in the District were openly opposed to the school millage, and that such individuals were not disciplined for their views. (Br. at 8-9.)  To illustrate, Defendants point to a music teacher at Eisenhower Elementary School who was not terminated even though she actively opposed the millage.  (Rice Dep. at 54-55.) Plaintiff, in turn, asserts that the music teacher, a union member, was not similarly-situated to Plaintiff, a non-union member, because the music teacher, unlike Plaintiff, could not be terminated without receiving the process that the applicable collective bargaining agreement

18

requires.  (Rice Dep. at 58; Saxton Dep. at 67; Resp. at 13.)  Defendants argue that, because the

collective bargaining agreement did not bar the Defendants from disciplining the music teacher,

Plaintiff and the teacher are similarly-situated at least for purposes of discipline.  (Reply at 3.)

Yet, presumably, the applicable collective bargaining agreement would afford the music teacher

grievance and arbitration rights.

Defendants assert that Plaintiff was terminated based upon the manner of his speech–i.e.

that it was combative and disruptive–while Plaintiff contends that he was terminated based upon

the content of his speech–i.e. that he expressed reasons for opposing the millage.  (Br. at 6-7.)

Defendants do not contend that the District's legitimate interests outweighed Plaintiff's interest

in expressing that content such that Plaintiff's speech, based upon its content alone, was

unprotected.  Plaintiff, in turn, does not contend that his speech, based upon its manner alone,

would have been unprotected if that manner were, in fact, combative and disruptive as alleged.

Thus, Plaintiff's § 1983 claims, as framed by the parties, turn on whether Defendants, in fact,

had reason to believe that the manner of Plaintiff's speech was combative and disruptive.  This

issue turns on credibility determinations that are best left to the fact-finder.  In sum, when

viewed in the light most favorable to Plaintiff, the record evidence demonstrates that Defendants

had no legitimate reason to believe that the manner of Plaintiff's speech was combative and

disruptive such that Defendants violated Plaintiff's First Amendment rights by discharging him

based upon the content of his constitutionally-protected speech.  (Resp. at 1, 15.)

## 2.  Qualified Immunity

The doctrine of qualified immunity affords "not a defense to liability," but, rather, "an

immunity from suit altogether . . . to avoid [the] burdens of [the] costs of trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985).  Under the qualified-immunity doctrine, government officials performing discretionary functions are not liable for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  In determining whether a government official is entitled to qualified immunity, a court must first determine whether the facts alleged, when viewed in the light most favorable to the party asserting the injury, show that the public official's conduct violated a constitutional right, and, if so, whether that right was so clearly established that a reasonable official would understand that his particular conduct would violate that right. *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001).  A government official is entitled to qualified immunity where he "acted under the objectively reasonable belief that his or her actions were lawful." *Ahlers v. Schebil,* 188 F.3d 365, 373 (6th Cir. 1999) (citing *Harlow*, 457 U.S. at 815-19.)

The individual Defendants assert that they are entitled to qualified immunity because reasonable officials in their position, upon balancing Plaintiff's and the District's respective interests, would have believed that "Plaintiff's disruptive behavior" unduly threatened the District's efficient operation and, thus, that Plaintiff's removal as a substitute teacher from the District was lawful under the First Amendment.  (Br. at 10.)   In support, Defendants underscore that the "*Pickering* balancing test is fraught with judgment calls and subjective analyses that smudge the edges of this area of law." *See DiMeglio v. Haines,* 45 F.3d 790, 806 (4th Cir. 1995) ("[O]nly infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a

20

'particularized balancing' that is subtle, difficult to apply, and not yet well defined.'")

Because qualified immunity is an immunity from suit altogether, the United States Court of Appeals for the Sixth Circuit has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Black v. Parke*, 4 F.3d 442, 445 (6th Cir. 1993) (internal quotation marks omitted). The Sixth Circuit has held that "issues of objective reasonableness and what is clearly established law are [questions of law that are] to be decided before trial" and that trial courts cannot avoid deciding those questions by characterizing them as disputed factual issues. *Id.* The Court has held, however, that, "if genuine issues of material fact exist as to whether the defendants actually did commit acts that would violate a clearly established right, then summary judgment on qualified immunity is improper." *Id.*

As to Muhammad and Saxton, genuine issues of material fact exist as to whether Defendants actually did commit acts that would violate Plaintiff's clearly established First Amendment rights. Specifically, genuine issues of material fact exist as to whether Muhammad and Saxton had reason to believe that the manner of Plaintiff's speech was combative and disruptive so as to render that speech unprotected or whether Plaintiff's removal was solely based upon the content of his speech. Because the facts upon which Muhammad's and Saxton's entitlement to qualified immunity turns are in dispute, they are not entitled to summary judgment at this stage.

However, the record evidence, even when viewed in Plaintiff's favor, demonstrates that Lewis is entitled to qualified immunity for their roles in Plaintiff's removal as a substitute teacher. A reasonable official in Lewis' position would have believed that the First Amendment would not prohibit Plaintiff's temporary removal from Levey's substitute teaching list pending

21

Saxton's investigation of the matter where Muhammad had reported that Plaintiff had engaged in an argument with staff members on school grounds and where Saxton, the administrator responsible for investigating a principal's recommendation for removing a substitute teacher, was out of the office at the time of the report.[13]  Of special note, Lewis testified that, upon her receipt of Muhammad's e-mail, she was concerned about the existence of the argument, not its content or Muhammad's opinion about its content. (Lewis Dep. at 20.)  Nothing in the record establishes otherwise.  Moreover, Saxton testified that, when she returned, Lewis told her that she removed Plaintiff from Levey's substitute-teaching list after speaking with Muhammad and that it was Saxton's responsibility to investigate his recommendation. (Saxton Dep. at 18.)  Lewis is entitled to qualified immunity on Plaintiff's § 1983 claims.

### B.  Tortious Interference with an Advantageous Business Relationship

To state a claim of tortious interference with a business relationship or expectancy under Michigan law, a plaintiff must allege: 1) the existence or expectancy of a business relationship with a third party; 2) the defendant's knowledge of the plaintiff's existing or expected business relationship; 3) that the defendant's intentional and improper interference with that existing or expected relationship induced or caused a breach, disruption, or termination of that relationship; and 4) that such interference injured the plaintiff.  *Mich. Podiatric Med. Ass'n v. Nat'l Foot Care Program, Inc.,* 175 Mich. App. 723, 735 (1989).  The plaintiff must also allege that the defendant committed either a "per se wrongful act" or a "lawful act with malice and unjustified in law," and that such an act was to "invad[e] the contractual rights or business relationship" of

---

[13]Plaintiff's claim against Lewis rests upon her directive to remove Plaintiff from Levey's substitute-teaching list pending Saxton's investigation.  (Pl. Dep. at 127-28.)

the plaintiff. *Wood v. Herndon & Herndon Investigations, Inc.,* 186 Mich. App. 495, 499-500 (1990).

Defendants argue that, because Plaintiff had not received a letter reasonably assuring him of employment for the 2004-2005 school year, Plaintiff, as a matter of law, had no reasonable expectancy of an employment relationship with the District for that year. (Br. at 11.) Defendants underscore that Plaintiff had not submitted an application to serve as a substitute teacher in the District for the 2004-2005 school year. (Pl. Dep. at 55-65.)

However, as Plaintiff aptly notes, once the District employs a substitute teacher, the teacher does not have to reapply for the position each year. (Resp. at 2; Lewis Dep. at 13.) Rather, the teacher remains in the substitute-teaching system unless or until the voluntary or involuntary termination of that employment. (*Id.*) Moreover, the District issues its letters of "reasonable assurance" of employment at the end of each school year for the following school year. (Saxton Dep. at 11-13; Lewis Dep. at 12.) From the time that he began serving as a substitute teacher with the District in 1999 until his removal from the District's substitute-teaching list in March of 2004, Plaintiff received annual "reasonable-assurance" letters from the District. (Pl.'s Ex. 10.) According to Plaintiff, he did not receive a "reasonable-assurance" letter from the District for the 2004-2005 school year only because he had been terminated before the District would have issued any such letter for that year. (Resp. at 17) Indeed, Saxton testified that the District would not have sent Plaintiff such a letter based upon his removal from the substitute-teaching list. (Saxton Dep. at 11-13.)

Defendants argue that Plaintiff, as a matter of law, has failed to establish that Defendants were third parties to Plaintiff's existing or expected employment relationship with the District.

23

(Br. at 11.)  For a tortious-interference claim to lie, the plaintiff must demonstrate that the defendant was a "third party" to the business relationship.  *Reed v. Mich. Metro Girl Scout Council,* 201 Mich. App. 10, 13 (1993).  ". . . [C]orporate agents are not liable for tortious interference with the corporation's contracts unless they acted solely for their own benefit with no benefit to the corporation."  *Id.* (requiring the corporate agent's motives to be "strictly personal").

Because the District cannot be a third party to any employment relationship with itself, Plaintiff's tortious-interference claim against the District fails as a matter of law.  As to the individual Defendants, Defendants argue that, in removing Plaintiff from the District's substitute-teaching list, they acted in their official capacities as agents of the District.  (Br. at 11.)

Plaintiff, in turn, argues that the facts, when viewed in his favor, demonstrate that the individual Defendants, in removing Plaintiff as a substitute teacher from the District, acted out of strictly-personal animosity without any benefit inuring to the District. (Resp. at 17-18.) According to Plaintiff, the individual Defendants discharged Plaintiff to punish him for "express[ing] an opposing view on a millage that Defendants were depending upon for their individual livelihoods" and to deter others from expressing such views.  (*Id.* at 18.)

Defendants argue that Muhammad requested Plaintiff's removal to maintain order at Levey.  (Reply at 5.)  Alternatively, Defendants contend that, even if Defendants discharged Plaintiff based upon the anti-millage content of his speech, their motives would not have been "strictly personal" since the controversy affected the District as well them personally. (*Id.*) Indeed, Rice testified that, if the millage failed, the District, along with laying off teachers, would have to consolidate schools and eliminate transportation services and buildings.  (Rice

24

Dep. at 22-24.)  Muhammad testified that he supported the millage "[f]or the benefit of the children" as well as for his own–that he would not be laid off. (Muhammad Dep. at 11-12.)

Plaintiff, as a matter of law, has failed to establish that Defendants were third parties to Plaintiff's existing or expected employment relationship with the District.  Plaintiff's tortious-interference claims necessarily fail.

## C.  Violation of Public Policy

Michigan law recognizes an exception to the employment-at-will doctrine where the ground for discharging the employee is "so contrary to public policy as to be actionable." *Suchodolski v. Mich. Consolidated Gas Co.,* 412 Mich. 692, 694-96 (1982).  "Most often these proscriptions are found in explicit legislative statements prohibiting the discharge, discipline, or other adverse treatment of employees who act in accordance with a statutory right or duty." *Id.* Additionally, the Michigan Courts "have found implied a prohibition on retaliatory discharges when the reason for the discharge was the employee's exercise of a right conferred by a well-established legislative enactment." *Id.*

Plaintiff maintains that his removal from the District's substitute-teaching list violated the public policy set forth in Michigan's Election Law, M.C.L.A. 168.931(1)(d).[14] (Resp. at 18.) M.C.L.A. 168.931(1)(d), provides:  "A person shall not, either directly or indirectly, discharge or threaten to discharge an employee of the person for the purpose of influencing the employee's vote at an election."  Plaintiff claims that this statute evidences "an intent to protect employees

---

[14]Defendants initially contend that Plaintiff's public-policy claim fails as a matter of law due to Plaintiff's misplaced reliance upon  M.C.L. 168.931(1)(b), whose offenses require the receipt or agreement to receive "valuable consideration" as an element.  (Br. at 12.)  However, Defendants' contention is, in fact, off-point because Plaintiff relies upon subsection (d), not (b) of M.C.L. 168.931(1).

from retaliatory discharge based on their voting preferences in order to protect the purity of elections." (Resp. at 19.)

Plaintiff contends that the facts, when viewed in his favor, demonstrate that Plaintiff's discharge violated this public policy. (Resp. at 19.) In support, Plaintiff underscores the following: 1) Defendants actively participated in campaign efforts in support of the millage (Muhammad Dep. at 10; Lewis Dep. at 18; Rice Dep. at 26-28.); 2) all employees were asked to support the millage (Lewis Dep. at 18.); 3) as a Southfield resident, Plaintiff was eligible to vote in the election; 4) Defendants discharged Plaintiff only a few days before the election on the school millage; 5) Muhammad's e-mail found "appalling" the anti-millage content of Plaintiff's speech and evidences an animus for that content; and 6) on the day of the millage election, Saxton advised Plaintiff that one had to support the millage to work in the District (Pl. Dep. at 114.). (Resp. at 19.)

Defendants maintain that Plaintiff, as a matter of law, has failed to demonstrate that Defendants attempted to influence his vote on the millage and, thus, undermine the purity of the millage election. (Br. at 12; Reply at 5.) As Defendants note, Plaintiff testified that he never stated that he opposed the millage, only that he understood why other people opposed the millage. (Pl. Dep. at 117-18.) Plaintiff testified that, because one's voting preference is "personal," he never told anyone how he was going to vote on the millage election. (*Id.* at 118.) Even assuming that Defendants terminated Plaintiff based upon the content of his speech, that content, according to Plaintiff, consisted of the expression of theoretical reasons for opposing the millage not the expression of Plaintiff's actual opposition to the millage. However, Carter, Weaver, Zager, and Muhammad perceived Plaintiff's speech as expressing his actual opposition

26

to the millage.

One could argue that discharging an employee for expressing his personal opposition to the millage in the workplace would not dissuade the employee from voting in favor of the millage, contrary to public policy, but, rather, would simply dissuade him from expressing such personal opposition in the workplace in the first instance.[15]  Of special note, Lewis testified that, although all employees in the District were asked to support the millage, there was no mandate that they vote in favor of the millage.  (Lewis Dep. at 18-19.)  While the latter scenario may well violate the employee's First Amendment rights, it would not violate the public policy embodied in the election law.  In any event, as Defendants point out, Plaintiff testified that he advised Saxton, the administrator responsible for investigating Muhammad's recommendation, that the report that he was opposed to the millage was a "misunderstanding," and that he simply stated that he could understand why some people in the District were opposed to the millage–i.e. that he was merely playing "devil's advocate."  (Pl. Dep. at 123-24.)  Thus, even Plaintiff's own testimony demonstrates that Defendants did not remove Plaintiff from the District's substitute-teaching list for purposes of influencing his vote on the millage.  Plaintiff's public-policy claims, as framed by Plaintiff, fail as a matter of law.

### III.  SUMMARY

For the preceding reasons, the Court:

1)      DENIES the District, Muhammad, and Saxton summary judgment on Plaintiff's § 1983 claims because genuine issues of material fact exist as to whether Defendants discharged Plaintiff based upon the content of his speech and the individual Defendants' entitlement to qualified immunity turns upon such issues

---

[15]Indeed, at oral argument, Plaintiff argued that every other employee who learned of Plaintiff's removal would "think twice about voicing opposition [to the millage] in the future."

27

of fact;

2)      GRANTS Lewis summary judgment on Plaintiff's § 1983 claims because the record evidence, even when viewed in Plaintiff's favor, demonstrates her entitlement to qualified immunity;

3)      GRANTS Defendants' motion for summary judgment on Plaintiff's state-law claims of tortious interference with his employment relationship with the District because Plaintiff, as a matter of law, has failed to demonstrate that Defendants are third parties to that relationship; and

4)      GRANTS Defendants' motion for summary judgment on Plaintiff's state-law public-policy claims because Plaintiff, as a matter of law, has failed to demonstrate that Defendants discharged Plaintiff so as to influence his vote on the millage election.

SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  August 9, 2005

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on August 9, 2005.

s/Jonie Parker
Case Manager

28